1  SANDFORD L. FREY (State Bar No. 117058)
   RICHARD C. MACIAS (State Bar No. 071772)
2  CREIM MACIAS KOENIG & FREY LLP
   633 W. Fifth Street, 51st Floor
3  Los Angeles, California 90071
   Telephone:  (213) 614-1944
4  Facsimile:  (213) 614-1961
   sfrey@cmkllp.com
5  rmacias@cmkllp.com

6

7  [Proposed] Reorganization Attorneys for Debtor and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT
               CENTRAL DISTRICT OF CALIFORNIA
9                  [LOS ANGELES DIVISION]

10 In re                                )   CASE NO.: 2:10-bk-16897-SB
                                        )
11 NGTV, a California corporation,      )   Chapter 11
                                        )
12         Debtor and Debtor in Possession.  )
                                        )   NOTICE OF REVISED MOTION AND
13                                      )   REVISED MOTION OF DEBTOR IN
                                        )   POSSESSION FOR ORDER (1)
14                                      )   APPROVING SALE PROCEDURES AND
                                        )   BID PROTECTIONS, INCLUDING
15                                      )   EXPENSE REIMBURSEMENT, IN
                                        )   CONNECTION WITH THE SALE OF
16                                      )   CERTAIN ASSETS OF THE DEBTOR; (2)
                                        )   SCHEDULING AN AUCTION AND A
17                                      )   HEARING TO CONSIDER APPROVAL OF
                                        )   SALE; (3) APPROVING NOTICE OF
18                                      )   AUCTION AND HEARING ON APPROVAL
                                        )   OF SALE; (4) APPROVING THE ASSET
19                                      )   PURCHASE AGREEMENT WITH THE
                                        )   STALKING HORSE BIDDER; (5)
20                                      )   APPROVING THE RIGHT TO CREDIT BID
                                        )   UNDER SECTION 363(k); (6) APPROVING
21                                      )   THE PROCEDURES FOR THE
                                        )   ASSUMPTION AND ASSIGNMENT OF
22                                      )   CERTAIN EXECUTORY CONTRACTS;
                                        )   AND, (7) GRANTING RELATED RELIEF;
23                                      )   MEMORANDUM OF POINTS AND
                                        )   AUTHORITIES; DECLARATION IN
24                                      )   SUPPORT
                                        )
25                                      )
                                        )
26                                      )
                                        )
27                                      )   [Bankruptcy Code §§ 105, 363 and 365; FRBP
                                        )   2002, 6004, 6006 and 9014; LBR 6004-1(b)(3)-
28                                          (b)(4), 5005-2(d), and, 9013-1 (h)]

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-1-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

)
)
)
)
)
)
)
)
)
)

**Original Hearing held on**:
DATE:        June 28, 2010
TIME:        11:00 a.m.

**Continued Hearing to be held on**:
DATE:        July 20, 2010
TIME:        11:00 a.m.
CTRM.:       Courtroom 1575

CREIM MACIAS KOENIG & FREY LLP
613 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................8

II.     BACKGROUND ................................................................10

    A.    Factual Background ........................................10

    B.    Primary Assets ...............................................11

    C.    Senior Secured Creditors ..............................12

    D.    Junior Secured Creditors ...............................12

    E.    Equipment Leases ..........................................12

    F.    InterCreditor Agreement ...............................13

    G.    Jurisdiction and Venue ...................................15

    H.    Marketing of the Property .............................15

III.    SALE PROCEDURES ........................................................17

    A.    Property to be Sold Free and Clear of Liens .........18

    B.    Notice of Auction and Sale Hearing: .....................18

    C.    Opportunity for Due Diligence ........................19

    D.    Requirements for Each Offer ...........................19

    E.    Non-Conforming Bids ......................................20

    F.    Expenses ..........................................................20

    G.    Conflict ............................................................21

    H.    The Auction and Selection of the Successful Bid .........21

    I.    Sale Hearing .....................................................21

    J.    Objections .......................................................22

IV.     PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CONTRACTS ...............22

V.      ARGUMENT ................................................................24

    A.    Rebel should be authorized to credit Bid .............26

VI.     CONCLUSION ................................................................31

DECLARATION OF KOUROSH TAJ ................................................32

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

i

# TABLE OF AUTHORITIES

Cases

Cello Bag Co. v. Champion Intl Corn (In re Atlanta Packaging Prods., Inc.), 99
    B.R. 124, 131 (Bankr. N.D. Ga. 1988) ...................................................................25

In re California Hancock, 88 B.R. 226, 230 (9th Cir. B.A.P. 1998) .................................28

In re Crown Corp., 679 F.2d 774 (9th Cir. 1982) .............................................................25

In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Ban. S.D.N.Y. 1990) ............25

In re Financial News Network, Inc., 931 F.2d 217 (2d Cir. 1991).....................................25

In re Food Barn Stores, Inc., 107 F.3d 558,564-65 (8th Cir. 1997) .................................24

In re Integrated Res., Inc., 147 B.R. 650, 659 (S.D. N.Y. 1992)........................................24

In re Kent Terminal, 166 B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) ...............................28

In re Philadelphia Newspapers, LLC, 599 F.3d 298 (3rd Cir. 2010) ...........................9, 27, 28, 29

Statutes

11 U.S.C. § 1107(a) ...........................................................................................................10

11 U.S.C. § 1108 ...............................................................................................................10

11 U.S.C. § 1129(b)(2)(A)(iii) and (iii)..............................................................................28

28 U.S.C. § 1334(b)...........................................................................................................10

28 U.S.C. § 1408 ...............................................................................................................15

28 U.S.C. § 1409 ...............................................................................................................15

28 U.S.C. § 157(b)(2)(A), (D), (K) and (M) .................................................................10, 15

Rules

Bankruptcy Rule 6004(f)(1) ..............................................................................................17

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

ii

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**TO: THE HONORABLE SAMUEL L. BUFFORD, UNITED STATES BANKRUPTCY JUDGE, ALL ASSERTED SECURED CREDITORS, INTERESTED PARTIES, PARTIES WHO HAVE FILED REQUESTS FOR NOTICE, AND THE OFFICE OF THE UNITED STATES TRUSTEE:**

**PLEASE TAKE NOTICE** that on July 20, 2010, at 11:00 a.m., the Honorable Samuel L. Bufford, in Courtroom "1575" of the United States Bankruptcy Court, located at 255 East Temple Street, Los Angeles, California, 90012, will hear the motion (the "Motion") filed by NGTV, a California corporation, Debtor and Debtor-in-Possession (the "Debtor"), for entry of an order (the "Sale Procedures Order") pursuant to Title 11, United States Code (the "Bankruptcy Code"), Sections 105, 363 and 365 and Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule" and collectively, the "Bankruptcy Rules") 2002, 6004, 6006 and 9014:

(a) Approving the proposed sale procedures, including the overbid provisions (the "Sale Procedures"), set forth below and in ***Exhibit "A"*** attached hereto in connection with the proposed sale at auction (the "Auction") of substantially all of Debtor's assets, as described in the Asset Purchase Agreement ("APA") , a copy of which is attached hereto as ***Exhibit "B"***[1] (collectively, the "Assets"), and any and all rights, permits and licenses pertaining to the Assets (collectively with the Assets, the "Property"), pursuant to the terms of the APA, free and clear of all claims, liens, interests and encumbrances, except for certain permitted encumbrances, to Rebel Media, Ltd., a United Kingdom company ("Rebel") or its designee (Rebel or its designee is referred to as the "Stalking Horse Bidder"), or such other party making a higher and better bid at the Auction, pursuant to sections 105 and 363(b), (f) and (m) of the Bankruptcy Code;

(b) Approving the Stalking Horse Bidder's status as the stalking horse purchaser of the Property and permitting it to credit bid all or a portion of its secured claim pursuant to Bankruptcy Code § 363(k);

(c) Approving the APA and authorizing the Debtor to execute the final APA;

(d) Approving the initial overbid increment of $25,000 and subsequent overbids of $10,000 (the "Overbid Increment") pursuant to the terms of the APA;

(e) Scheduling (1) the place, date and time of the Auction and (2) the date and time of the hearing (the "Sale Hearing") on the motion (the "Sale Motion") to consider the approval of the sale of the Property (the "Sale") and the assumption and assignment of certain executory contracts to which the Debtor is a party that are not required to be terminated as of the Closing Date, as listed on the Schedules to the APA (the "Selected Contracts");

---

[1]   Rebel has agreed to increase the purchase price it is paying by an additional $100,000 cash to be paid to the estate at closing.  Rebel and Debtor will amend the APA to reflect the additional $100,000.

(f) Approving the proposed form of the notice of the Auction and the Sale Hearing (the "Notice of Auction and Sale Hearing"), substantially in the form attached hereto as ***Exhibit "C"***, and the manner of service of same;

(g) Authorizing the Stalking Horse Bidder's right to credit bid up to the full amount of its secured claim under Bankruptcy Code Section 363(k);

(h) Approving the procedures for the assumption and assignment of the Selected Contracts to which the Debtor is a party;

(i) Approving reimbursement of certain loans made by the Stalking Horse Bidder to the Debtor in connection with the chapter 11 case as discussed below in the amount of $200,000 ("Expense Reimbursement") in the event that the Successful Bidder is not the Stalking Horse Bidder;

(j) Approving the form of notice (the "Cure Notice"), substantially in the form attached hereto as ***Exhibit "D"***, to be served on the non-Debtor parties (collectively, the "Counterparties" an individually, a "Counterparty") to the Selected Contracts stating the respective deadlines by which objections to the assumption of assignment of any of the Selected Contracts must be filed and served and identifying the amounts, if any, that the Debtor believes are owed to each of the Counterparties in order to cure any defaults that must be cured pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"), and the manner of service thereof; and

(k) Granting such other relief as is fair and equitable.

**PLEASE TAKE FURTHER NOTICE** that the Sale Procedures being proposed are summarized as follows:

(a) On or before 21 days prior to the Sale Hearing, the Debtor will file and serve the Sale Motion (as defined below) on the Sale Notice Parties and commence the other Sale Proceedings (as defined below). The Debtor will also serve the APA, the Notice of Auction and Sale Hearing substantially in the form attached as ***Exhibit "C"*** to this Motion, a copy of the Sale Procedures substantially in the form attached as ***Exhibit "A"*** to this Motion, and the Sale Procedures Order on the Sale Notice Parties.

(b) Prior to being permitted to conduct any due diligence, a Potential Purchaser must execute a confidentiality agreement in form and substance satisfactory to the Debtor.

(c) Potential Purchasers may submit any offers to the Debtor by delivering the Offer to Sandford L. Frey at the offices of Creim Macias Koenig & Frey LLP, 633 W. 5th Street, 51st Floor, Los Angeles, California 90071 prior to the Sale Hearing (as defined below) or may appear at the Sale Hearing and bid. Each Offer must satisfy all of the following conditions (hereinafter referred to as an "Offer"):

(1) <u>Terms of Offer</u>. An Offer must be for at least $1,685,000 (which is inclusive of the Expense Reimbursement).

-4-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

(2) Good Faith Deposit. An Offer (except the Stalking Horse Bidder's offer) shall also be accompanied by a deposit paid to the Debtor in an amount equal to ten percent (10%) of the offered purchase price (the "Good Faith Deposit"); provided, however, that the Stalking Horse Bidder shall not be required to deliver a deposit to Seller. Each Good Faith Deposit shall be payable in U.S. dollars to the Debtor. The Good Faith Deposit shall be irrevocable. Each Good Faith Deposit shall be provided to and held by counsel to the Debtor in an interest-bearing account until three days after the Sale Order is entered, after which time the Good Faith Deposits of the bidders that were not selected as the Successful Bidder or the Back-Up Bidder shall be returned.

(3) Proof of Financial Ability. An Offer must accompanied by evidence satisfactory to the Court of financial ability to close within the time frame established by the Court.

(4) Identity of Bidder and Legal Power. An Offer must disclose the identity of the Potential Purchaser, including confirmation that its bid is made as principal for the Potential Purchaser's account and, if not, the basis upon which the Potential Purchaser is acting and the identities of all other participants (if any). It must also disclose any agreements or understandings between the Potential Purchaser and any third party with respect to the Property. The Offer must also be accompanied by sufficient indicia satisfactory to the Court that the person submitting the Offer is legally empowered, by power of attorney or otherwise, to (i) bid on behalf of the Potential Purchaser, and (ii) complete and sign, on behalf of the Potential Purchaser, a binding and enforceable Bidder Purchase Agreement.

(5) Due Diligence; Acknowledgment; Release. The Offer must contain an acknowledgement and representation that the Potential Purchaser: (i) had an opportunity to conduct any and all due diligence regarding the Property prior to making the Offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its Offer; and, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder Purchase Agreement.

(d) Any opposition to the relief requested in any of the Sale Proceedings must be in writing and filed and served so that it is received by counsel for the Debtor and counsel for the Stalking Horse Bidder not later than fourteen (14) days prior to the Sale Hearing (as defined below).

(e) On or before fourteen (14) days prior to the Sale Hearing (as defined below) , the Debtor will serve a Cure Notice, substantially in the form attached hereto as Exhibit "D", on Counterparties to executory contracts to which the Debtor is a party. Such Counterparties shall

-5-

have until seven (7) days prior to the Sale Hearing (as defined below) to file and serve any written response to dispute the amount set forth in such Cure Notice.

(f) Any reply to papers filed in opposition to the Sale Proceedings must be filed and served so that it is actually received not later than seven (7) days prior to the Sale Hearing (as defined below).

(g) The Auction will be conducted on the date and time of the Sale Hearing in Courtroom 1575; 255 E. Temple Street; Los Angeles, CA 90012 , the Honorable Samuel L. Bufford, presiding.

(h) The hearing regarding the Sale Motion and any other Sale Proceedings shall be conducted on a date and time convenient to the Court to be set at the July 20th hearing set on this Motion (the "Sale Hearing"). At the Sale Hearing, the Court will conduct an auction among the Stalking Horse Bidder and other qualified Bidders.

(i) Assuming the conditions to the Sale have been met, the Closing will take place not later than (i) the first business day fourteen (14) days after the Sale Hearing , if the sale is to the Stalking Horse Bidder, or such later date as agreed to by the Stalking Horse Bidder and the Debtor, but in no event later than fourteen (14) days after the Sale Hearing; (ii) thirty (30) days after the Sale Hearing , if the sale is to the Successful Bidder; or, (iii) sixty (60) days after the Sale Hearing , if the sale is to a Back-Up Bidder other than the Stalking Horse Bidder.

**PLEASE TAKE FURTHER NOTICE** the above summary of the Sale Procedures is qualified in its entirety by the description of the Sale Procedures contained in the Sale Procedures attached hereto as ***Exhibit "A"***.  To the extent that there is any inconsistency between the above summary and the description in the attached ***Exhibit "A"***, the description in ***Exhibit "A"*** shall control. Accordingly, parties in interest are urged to review ***Exhibit" A"*** in its entirety

**PLEASE TAKE FURTHER NOTICE** that pursuant to the sale agreement, the Debtor intends to notice the Sale, Auction and Sale Hearing along with a description of the Property in the Los Angeles Times, New York Times, Wall Street Journal, internet and such other publication reasonably requested by parties in interest or required by the Court.  Rebel has agreed to advance up to $6,000 for purposes of advertising the sale, subject to the Expense Reimbursement.

**PLEASE TAKE FURTHER NOTICE** that, shortly after the entry of an order approving this Motion, the Debtor will file a sale motion (the "Sale Motion") and commence such other proceedings as may be necessary and proper to authorize and approve the sale of the Property free and clear of all claims, liens, rights, interests and encumbrances and the assumption and assignment of the Selected

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-6-

1  Contracts to the Stalking Horse Bidder or such other qualified Bidder at Auction submitting the

2  Successful Bid.

3      **PLEASE TAKE FURTHER NOTICE** that the Sale to the Stalking Horse Bidder, or to such

4  other qualified Bidder at Auction submitting the Successful Bid, is on an "as is, where is" basis,

5  without any representation or warranties, whatsoever, express or implied, including, without

6  limitation, any representations or warranties as to the physical condition.

7      **PLEASE TAKE FURTHER NOTICE** that this Motion is based on the Declaration of

8  Kourosh Taj, filed concurrently herewith; the supporting Memorandum of Points and Authorities; the

9  statements, arguments and representations of counsel who appear at the hearing regarding the Motion;

10  the record in this case; any other evidence properly before the Court prior to or at the Sale Procedures

11  Hearing and all matters of which this Court may property take judicial notice.

12      **PLEASE TAKE FURTHER NOTICE** that the hearing on this Motion has been set on seven

13  (7) days notice to you, pursuant to Local Bankruptcy Rules for the Central District of California (each

14  an "LBR" and collectively the "LBRs") 6004-1(b)(3); and that, pursuant to LBR 6004-1(b)(4), any

15  opposition the Motion must be filed and served at least one (1) day prior to the hearing on this Motion.

16  All responses to the Motion must be served by personal delivery, messenger, fax, or e-mail upon (i)

17  counsel for the Debtor (Creim Macias Koenig & Frey LLP; 633 W. 5th Street; 51st Floor; Los Angeles,

18  California 90071, Attn.: Sandford L. Frey; fax: (213) 614-1961; sfrey@cmkllp.com); and (ii) counsel

19  for the Stalking Horse Bidder (Sheppard Mullin Richter & Hampton LLP, 333 South Hope Street, 43rd

20  Floor, Los Angeles, California 90071, Attn: Richard W. Brunette; fax (213) 620-1398;

21  rbrunette@sheppardmullin.com).

22      **PLEASE TAKE FURTHER NOTICE** that, in accordance with LBR 5005-2(d), a paper copy

23  of any such opposition (which meets the requirements of LBR 9004-1(a)) must be marked "Judge's

24  Copy" and must be served on the chambers of the Honorable Samuel L. Bufford, located at the United

25  States Bankruptcy Court, 255 East Temple Street, Los Angeles, California, 90012; and, if such

26  opposition is filed electronically, it must be accompanied by a copy of the NEF confirming the filing.

27

28

-7-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    **PLEASE TAKE FURTHER NOTICE** that the failure to timely assert any opposition to the

2    Motion may be deemed by the Court to be consent to the granting of the relief requested in the Motion

3    pursuant to LBR 9013-1 (h).

4        **WHEREFORE**, the Debtor respectfully requests that the Court enter an order: (a) approving

5    the proposed Sale Procedures, including the Expense Reimbursement  and Overbid Increment; (b)

6    scheduling the dates and times of the Auction and Sale Hearing; (c) approving the APA and the

7    Stalking Horse Bidder and it's right to credit bid pursuant to Bankruptcy Code § 363(k); (d)

8    authorizing the Debtor to sign the APA; (e) approving the form of the proposed Notice of Auction and

9    Sale Hearing and the manner of service of same; (f) approving the procedures for the assumption and

10   assignment of certain executory contracts; (g) approving the form of the proposed Cure Notice and the

11   manner of service of same; and (h) granting such other relief as is fair and equitable.

12   Dated:  July 13, 2010                                    CREIM MACIAS KOENIG & FREY LLP

13

14                                                           By:  /s/Sandford L. Frey
                                                                  SANDFORD L. FREY
15                                                                RICHARD C. MACIAS
                                                                  [Proposed] Reorganization Attorneys for
16                                                                Debtor and Debtor in Possession

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

NGTV, a California corporation, debtor and debtor in possession in the above-captioned case ("NGTV" or the "Debtor") has filed this Motion of Debtor in Possession for Order (1) Approving Sale Procedures in Connection with the Sale of Certain Assets; (2) Scheduling an Auction and Hearing to Consider Approval of Sale; (3) Approving Notice of Auction and Hearing on Approval of Sale; (4) Approving the Asset Purchase Agreement with the Stalking Horse Bidder; (5) Approving the Right To Credit Bid under Section 363(k) (6) Approving the Procedures for the Assumption and Assignment of Contracts; and (7) Granting Related Relief (the "Motion"), because the Debtor has determined that the Sale of the Property in accordance with the Sale Procedures set forth herein to the Stalking Horse Bidder or other bidder at the Auction that submits the highest and best bid (the "Successful Bidder"), is the only viable alternative for the estate and will maximize the value of the Property for the benefit of the chapter 11 estate.

NGTV, which is an acronym for No Good TV, has lost money since its inception.  It owns assets consisting primarily of intellectual property in the form of unedited and uncensored celebrity interviews.  [See Declaration of Kourosh Taj at ¶6].  NGTV spent over $15 million of secured loans and additional millions in an effort to develop a profitable business model to exploit these celebrity interviews, without success.

NGTV has continued to lose money and cannot survive in its current form.  NGTV had filed chapter 11 in the hope of implementing a plan funded by its primary secured lender, Rebel.  Unfortunately, a final deal with Rebel never materialized.  Instead, Rebel has offered to acquire these assets for at least $1,660,000, consisting of a credit bid of $1,300,000, $100,000 in cash to the estate for creditors, an additional $144,000 in cash to pay the landlord's administrative rent claim, $60,000 in cash for administrative professional fees (subject to Court approval), and at least $6,000 in cash to pay for advertising of the sale.  In addition, Rebel Media previously loaned the estate $50,000 for administrative expenses.  If Rebel Media is the successful bidder, it will waive all claims for the

-9-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    $260,000 in administrative expense loans and the $100,000 for creditors.  Subject to overbids, NGTV

2    believes that the proposed sale will maximize value for the benefit of the estate and is the only viable

3    alternative left for NGTV.  This Motion seeks Court approval of the procedures proposed by the

4    Debtor.  This Motion does not seek approval of the sale itself.  Shortly after the entry of an order

5    approving this Motion, the Debtor intends to file a motion (the "Sale Motion") and commence such

6    other proceedings as may be necessary and proper to authorize and approve the sale of the Property

7    free and clear of all claims, liens, interests and encumbrances (collectively, "Liens"), with any such

8    Liens to attach to the net proceeds, if any, of the Sale to the same extent and nature, and with the same

9    validity (or invalidity) and priority as existed prior to the Sale, and the assumption and assignment of

10    the Selected Contracts to which the Debtor is party, to the Stalking Horse Bidder or such other

11    Qualified Bidder at Auction submitting the Successful Bid (collectively, "Sale Proceeds").

12    Thus, this Motion only seeks certain ancillary relief in connection with the Sale in order to

13    further expose the Property to competitive bidding and thereby maximize the value of the Property for

14    Creditors, rather than seeking actual approval of the Sale as will be sought through the Sale

15    Proceedings.  The Debtor intends to address more thoroughly in its Sale Motion, among other things,

16    the reasons as to why the sale is necessary and in the best interest of the estate.

17    The Debtor has no source of revenue with which to continue to fund operations, pay rent for its

18    commercial space, or to maintain its equipment, assets employees or physical facility.   Under the

19    current circumstances, the proposed auction at least provides the best means of producing some value

20    for the estate as compared with the alternative of foreclosure of the Debtor's assets by the senior

21    secured creditors.  Rebel has agreed to become a Stalking Horse Bidder by submitting a credit bid and

22    significant cash to the estate, and to pay the cost of advertising the sale so as to attempt to maximize

23    value.  As discussed below, the parties have addressed the two concerns raised by the Court at the

24    initial hearing: (i) the <u>Philadelphia Newspapers</u> case is distinguishable from the case before this Court

25    and should not preclude Rebel from credit bidding; and (2) Rebel has agreed to increase the purchase

26    price by $100,000 cash to go to the estate and creditors, bringing the total cash component of Rebel's

27    bid for the estate and creditors to $360,000.

28

-10-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

## II.

## BACKGROUND

A.    **FACTUAL BACKGROUND**

On February 25, 2010 ("Petition Date"), the Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").    The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    An official committee of creditor holding unsecured claims has not been formed.    The Court has core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (D), (K) and (M).

The Debtor is a California corporation.    The Debtor's primary business focus is a television content producer.    At the current time, the Debtor has no direct employees but contracts for employee services as the need arises.

The Debtor intended to file for Chapter 11 primarily to implement a reorganization plan or sale with the cooperation and consent of its senior secured lenders.    Unfortunately, negotiations were not complete, when mounting financial pressure compelled the Debtor to file Chapter 11 on an emergency basis in order to preserve the value of its assets.    Escalating pressures by a few creditors was slowing down and distracting the progress of concluding a prepackaged deal with Debtor's senior secured creditors.    Additionally, as discussed below, it was hoped that bankruptcy protection would assist the Debtor in reaching agreement for the preservation of its studio lease, which was in default.

As part of the negotiation toward a consensual plan, negotiations were held with Rebel for bridge debtor in possession financing necessary for the Debtor to pay, among other post petition obligations, its Chapter 11 professional fees and other administrative costs, including post petition rent on Debtor's studio lease.    Rebel agreed to loan the Debtor a $50,000 retainer for the Debtor's bankruptcy counsel.    This loan was approved by the Court and made by Rebel.    Moreover, based upon a recent stipulation among Debtor, Rebel, and Debtor's landlord, Rebel has agreed to fund $144,000 necessary to satisfy the landlord's post-petition rent obligations through July 31, 2010.    Upon Court

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

approval thereof, Rebel will make that loan.  Finally, Debtor and Rebel have reached agreement for a sale of Debtor's assets, which has resulted in this Motion.

In connection with the proposed sale, Rebel has agreed to provide the following consideration, subject to Bankruptcy Court authorization:

1.      Credit bid $1,300,000 of its secured claim pursuant to Bankruptcy Code § 363(k) subject to Bankruptcy Court authorization;

2.      Pay the sum of $100,000 in cash at closing to the Bankruptcy estate;

3.      Pay up to $60,000 in cash at closing pursuant to Bankruptcy Code § 506(c) to be used to satisfy professional fees approved by the Court and incurred by the estate in connection with the chapter 11 case;

4.      Pay $6,000 for advertising expenses for the Sale.

5.      If the Stalking Horse Bidder is the successful bidder, Rebel will waive its claim for advances made for professional fee retainers and to fund the settlement with the Debtor's Landlord in the approximate amount of $200,000.  However, in the event the Successful Bidder is not the Stalking Horse Bidder, the Stalking Horse Bidder seeks the Expense Reimbursement to compensate it for its actual out of pocket expense incurred in connection with the chapter 11 case.

6.      If the Stalking Horse Bidder is the successful bidder, Rebel will waive any right to payment to which it may be entitled pursuant to Bankruptcy Code § 506(c).

**B.   PRIMARY ASSETS**

The Debtor's primary assets are its content library, studio, and trade name and trademarks. The content library is a major asset of the Debtor.  However, the value of the content library is difficult to determine at this time.  Among other reasons, the library, which consists of hundreds of hours of raw footage of celebrity interviews, is subject to competing licensing restrictions and issues. In addition, most of the raw footage has not been produced or edited.  Further, there are unpaid productions costs which could impact its value.  Adding to the complexity of valuation is that the value of older footage is much lower than new footage, due to the topical nature of the footage and the

-12-

value may diminish further, since it is more difficult to exploit the archived footage, without adding new relevant footage.

## C.   SENIOR SECURED CREDITORS

| Creditor | Description | Est. Asserted Claim |
|---|---|---|
| Rebel | | $2,682,593 |
| Joloto LFG holdings Level 23 ("Joloto") (Currently Owned by Rebel) | | $6,595,440 |
| DLC Holdings ("DLC") | | $1,353,559 |
| Forum Fund ("Forum") | | $ 526,626 |
| LW Securities ("LW") | | $ 95,750 |

## D.   JUNIOR SECURED CREDITORS

| Creditor | Description | Est. Asserted Claim |
|---|---|---|
| Caroline Haney ("Haney") | | $ 161,520 |
| Jay Vir ("Vir") | | $1,356,597 |
| Joloto | | $1,484,002 |
| Kourosh Taj ("Taj") | | $ 242,312 |
| Richardson & Patel ("R&P") | | $ 862,590 |
| Savers Note/Intertainment M ("Intertainment") | | $3,023,960 |

## E.   EQUIPMENT LEASES

| Creditor | Description | Est. Asserted Claim |
|---|---|---|
| Avid Financial Services ("Avid") | Storage Tek | $ 315,778 |
| Avid | Branded Media | $ 34,515 |
| Avid | Avid Nitris System | $ 154,517 |
| Avid | Avid Unity Upgrade | $ 25,973 |
| Avid | Avid Unity Upgrade | $ 41,627 |

-13-

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| Creditor | Description | Est. Asserted Claim |
|---|---|---|
| Axis Media Pro | ProTools | Unknown |
| CIT Technology Financing | Avid Adrenalins (2) | $ 123,368 |
| IBM | IBM Intellistations | $ 39,180 |
| IBM | IBM Intellistations | $ 23,034 |
| IBM | Blade Server | $ 112,319 |
| Leaf Financial | ProTools | $ 24,861 |
| Lyon Financial Services ("Lyon") | ProTools-ICON | $ 62,981 |
| Lyon | Storage & Deck | $ 66,392 |
| Sun Microsystems | Storage Tek Upgrades | $ 52,176 |

**F.    INTERCREDITOR AGREEMENT**

Prior to the Petition Date, Joloto, Forum and LW and later DLC (collectively "Senior Creditors") entered into a Subordination and Intercreditor Agreement ("Intercreditor Agt") with, Taj, Vir, Haney, Intertainment, R&P and Richard David ("David" and together with Taj, Vir, Haney, Intertainment, and R&P, the "Subordinate Creditors")    A copy of the Intercreditor Agt is attached as ***Exhibit "E"***.  The Intercreditor Agt, among other things, (i) subordinates and restricts the rights of the Subordinate Creditors, and (ii) sets forth the relative rights among the Senior Creditors.  The Intercreditor Agt also provides with respect to bankruptcy of NGTV as follows:

> [I]n the event of any insolvency or bankruptcy proceedings . . . (A) the Senior Noteholders shall be Paid in Full in respect of all amounts constituting Senior Indebtedness before any Subordinate Noteholder is entitled to receive (whether directly or indirectly), or make any demands for, any payment and (B) until the Senior Indebtedness is Paid in Full, any payment or distribution to which any Subordinate Noteholder would otherwise be entitled shall be made ratably to the Senior Noteholders based on the outstanding amount of the Senior Notes held by each Senior Noteholder
>
> [Intercreditor Agt. Page 3, ¶2(a)(i)]

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

The Intercreditor Agt further provides as follows:

> Until the Senior Indebtedness has been paid in Full, whether or not an Insolvency Event has been commenced by or against the Company, the Subordinate Creditors:
>
>> (ii) will not contest, protest or object to any foreclosure proceeding or action brought by a Senior Noteholder or any other exercise by the Senior Noteholders of any rights and remedies relating to the Collateral or otherwise; and
>>
>> (v) hereby waive any and all rights they may have as a junior lien creditor or otherwise to object to the manner in which the Senior Noteholders seek to enforce or collect the obligations under the Senior Notes or the Liens securing Secured Obligations granted in any Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by a Senior Noteholder is adverse to the interests of the Subordinate Noteholders

[Intercreditor Agt. Page 6, ¶2(g)(ii) and (v)]

The Intercreditor Agt further provides as follows:

> (h) <u>Insolvency or Liquidation Proceedings</u>. Until the Senior Indebtedness has been Paid in Full, if the Company shall be subject to an insolvency or liquidation proceeding, the Subordinate Creditors:
>
>> (i) will not make any bid at any foreclosure sale or other sale of any of the Collateral unless all consideration shall be paid in cash upon such acquisition or closing or such purchase; <u>provided</u> that in no event shall the Subordinate Creditors be allowed to credit bid;
>>
>> (ii) agree to waive any rights they may have to object to a sale of the Collateral pursuant to Section 363(f) of the Bankruptcy Code.

[Intercreditor Agt. Page 7, ¶2(h)(i) and (ii)]

With respect to the relative rights of the Senior Creditors, the Intercreditor Agt states as follows:

> (a) <u>Relative Priorities</u>. Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Senior Indebtedness granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or any defect or deficiencies in, or failure to perfect, the Liens securing the Senior Indebtedness or any other circumstance whatsoever, each Senior Noteholder hereby agrees that any Lien on the Collateral securing Senior Indebtedness now or hereafter held by or on behalf of a Senior Noteholder regardless of how acquired, whether by grant, possession, statute,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

operation of law, subrogation or otherwise, shall be deemed pari passu in right, priority, operation, effect and all other respects to any Lien on the Collateral securing any other Senior Indebtedness.

[Intercreditor Agt. Page 7, ¶3(a)]

With respect to the rights of the Senior Creditors vis a vis one another, the Intercreditor Agt states as follows:

3(d)    Exercise of Remedies. The Senior Noteholders agree that upon an Event of Default, the Senior Noteholders may exercise any rights or remedies available with respect to the Collateral or institute any action or proceeding with respect to such rights or remedies upon consent by a majority of the Senior Noteholders based on the outstanding amount of the Senior Notes held by each Senior Noteholder.

3(g)    Credit Bid(s). Any Senior Noteholder may make a credit bid at any foreclosure sale or other sale of any of the Collateral; provided, that the other Senior Noteholders receive a cash payment as a result of such credit bid equal to their ratable share of the consideration that would have been received under this Agreement had such credit bid been paid in cash.

Based on (i) loans made directly by Rebel to Debtor, and (ii) loans made by Joloto to Debtor, which loans have been assigned to Rebel, Rebel holds a majority of the Senior Notes.

## G.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## H.    MARKETING OF THE PROPERTY

Prior to and after the Petition Date, the Debtor aggressively sought badly needed capital. Some of those efforts are generally described in the declaration filed in support of this Motion and will be supplemented in the Sale Motion to be filed subsequently. Suffice it to say, the Debtor has been unsuccessful in raising capital to fund the going concern and purchase the ongoing operations. Rebel was the Debtor's last hope, which efforts unfortunately failed.

The Debtor intends to notice the Sale, Auction and Sale Hearing along with a description of the Property in the Los Angeles Times, ensuring the Property's exposure to that publications' circulation

-16-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

of approximately 600,000 readership. In addition, the Debtor intends to notice the Sale, Auction and Sale Hearing in the New York Times, Wall Street Journal, on the internet, and in such other publication reasonably requested by parties in interest or required by the Court. Rebel has agreed to advance up to $6,000 for purposes of advertising the sale. Rebel is further willing to pay advertising costs in excess of $6000 that are reasonable and necessary.

In June 2010, after extensive negotiations, Rebel elected not to continue to fund the Debtor or to proceed with a reorganization plan. Both before the Petition Date and after, the Debtor sought alternate financing sources or purchasers for the going concern. However, to date, those efforts have not located alternatives primarily due to the large amount of debt resulting largely from the failed private offering.

As a result, the Debtor entered into the APA with the Stalking Horse Bidder. A copy of the APA, without schedules and exhibits, is attached hereto as Exhibit "B". Pursuant to the terms of the APA, the Stalking Horse Bidder, subject to (1) a court-approved auction and sale process, approval of which is sought by this Motion and (2) the submission of higher and better offers, will purchase the Property through a credit bid under Bankruptcy Code Section 363(k), and additional consideration discussed above.

The terms of the Stalking Horse Bidder's offer to purchase the Property are set forth in full in the APA and are summarized below. The description below only summarizes certain provisions of the APA, and the terms of the APA control in the event of any inconsistency.

1.    Purchase Price. The total "consideration" for the Property submitted by the Stalking Horse Bidder consists of: (a) a credit bid of the Rebel/Joloto secured claim pursuant to Bankruptcy Code § 363(k) in the amount of $1,300,000; (b) a cash payment to the estate in an amount of $100,000; (c) a cash payment up to $60,000 at closing pursuant to Bankruptcy Code § 506(c) to be used to satisfy professional fees approved by the Court and incurred by the estate in connection with the chapter 11 case; (d) a cash payment to the estate in an amount not to exceed $6,000 to cover

-17-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

advertising costs for the Sale;[2] and (c) a credit for the DIP Loans made by Rebel in the amount $194,000 (collectively the "Purchase Price").

2.    <u>Assets</u>.    The assets subject to the Sale are substantially all of Debtor's assets, as described in the APA [Exhibit "B"], and any and all rights, permits and licenses pertaining to the Assets, which sale shall be free and clear of all claims, liens, rights, interests and encumbrances

3.    <u>Assumed Obligations</u>.    Obligations, if any, associated with any contracts or leases to be assumed and assigned to Stalking Horse Bidder.

4    <u>Additional Contracts to be Assumed and Assigned</u>.    The Debtor shall assume and assign , pursuant to Bankruptcy Code § 365 the Selected Contracts to which it is a party as set forth in Schedules attached to the APA.

5.    <u>Expense Reimbursement</u>.    The Motion seeks authority of the Court to reimburse the Expense Reimbursement consisting of certain loans made by the Stalking Horse Bidder to the Debtor in connection with the Chapter 11 case, in the event that the Successful Bidder is not the Stalking Horse Bidder

6.    <u>Closing</u>.    The Closing will take place not later than (i) the first business day after fourteen (14) days after the Sale Hearing , if the sale is to the Stalking Horse Bidder, or such later date as agreed to by the Stalking Horse Bidder and the Debtor, but in no event later than fourteen (14) days after the Sale Hearing; (ii) thirty (30) days after the Sale Hearing , if the sale is to the Successful Bidder; or, (iii) sixty (60) days after the Sale Hearing , if the sale is to a Back-Up Bidder other than the Stalking Horse Bidder.

**III.**

**SALE PROCEDURES**

In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.    The primary assets in this case consist of the Debtor's intellectual property and the content library, the value of which is difficult, if not impossible,

---

[2] Rebel is further willing to pay advertising costs in excess of $6000 that are reasonable and necessary.

-18-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

to determine.  Prior to and after the Petition Date, the Debtor made efforts to seek alternatives to the proposed sale as set forth in the Declaration of Kourosh Taj attached hereto.

Faced with no feasible alternative financing or sales for the going concern, and Rebel being unwilling to continue to advance funds for operations, the Debtor has accepted Rebel, as the Stalking Horse Bidder because, among other reasons, it does not appear that there is another buyer willing to pay a purchase price in excess of the Senior Noteholders that will result in a more favorable disposition for the case than the proposal made by Rebel.  Furthermore, there does not appear to be a viable alternate source of funding.  Therefore, the parties have negotiated the terms of the APA.

The Debtor hopes that higher and better offers are made.  To that end, the Debtor is making the additional marketing efforts discussed above.  Good cause, therefore, exists to expose the Property to sale at the Auction in the hope of procuring a more favorable bid for the Property.  To accomplish that end, the Debtor requests approval of the following Sale Procedures:

**A.    PROPERTY TO BE SOLD FREE AND CLEAR OF LIENS**

The Debtor proposes to sell the Property free and clear of all Liens whatsoever, in accordance with Bankruptcy Code §§ 363(b) and (f), with all then-existing Liens to attach to the net proceeds, if any, of the sale of the Property to the same extent and nature and with the same validity and priority as existed prior to the sale.  The proceeds of the sale, if any, will be held in a segregated account by the Debtor until all disputes concerning entitlement to the proceeds are resolved.

**B.    NOTICE OF AUCTION AND SALE HEARING:**

On or before twenty-one (21) days prior to the Sale Hearing, the Debtor proposes to serve the Sale Motion; the APA substantially in the form attached hereto as ***Exhibit "B"***; the Notice of Auction and Sale Hearing substantially in the form attached hereto as ***Exhibit "C"***; the Sale Procedures substantially in the form attached hereto as ***Exhibit" A"***; and, the Sale Procedures Order, by first-class mail, postage prepaid, upon (a) the Office of the United States Trustee; (b) the Stalking Horse Bidder and its counsel; (c) counsel to DLC; (d) the members of the Debtor's board of directors; (e) all entities known to have asserted any Lien against the Property; (f) all entities that executed confidentiality agreements or who otherwise have expressed to the Debtor or any of its professionals an interest in

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-19-

1    purchasing the Property; (g) all federal, state, and local regulatory or taxing authorities or recording

2    offices which have a reasonably known interest in the relief requested by the Sale Motion; (h) the

3    Internal Revenue Service; (i) all entities on the 2002 Service List in this case; (j) all unsecured

4    creditors that are scheduled or have filed proofs of claim; (k) all parties to any Assumed Contracts;

5    and (k) any party requesting special notice (collectively, the "Sale Notice Parties").

6    **C.    OPPORTUNITY FOR DUE DILIGENCE**

7        As described above, all parties other than the Stalking Horse Bidder interested in acquiring the

8    Property (the "Potential Purchasers") and the Stalking Horse Bidder will be allowed to conduct

9    reasonable due diligence prior to the Sale Hearing.  The Debtor will provide Potential Purchasers and

10   continue to provide the Stalking Horse Bidder with reasonable access to the Property, related books

11   and records, and other information for the purpose of conducting due diligence.  Prior to being

12   permitted to conduct any due diligence, the Motion seeks approval of the Court for the Debtor to

13   require that a Potential Purchaser execute a confidentiality agreement in form and substance

14   reasonably satisfactory to the Debtor.

15   **D.    REQUIREMENTS FOR EACH OFFER**

16       Each Offer must be in writing and satisfy the following conditions:

17       1.    Terms of Offer.  An Offer must be for at least $1,685,000 (which is inclusive of the

18   Expense Reimbursement), which is the Stalking Horse Bidder's Purchase Price plus $25,000.

19       2.    Good Faith Deposit.  An Offer shall also be accompanied the Good Faith Deposit (as

20   defined above), provided, however, that the Stalking Horse Bidder shall not be required to provide a

21   deposit.  Each Good Faith Deposit shall be provided to and held by counsel to the Debtor in an interest

22   bearing account until the third day after the order approving the sale of the Property is entered, after

23   which time the Good Faith Deposits of the bidders that were not selected as the Successful Bidder or

24   the bidder with the Back-Up Bid (the "Back-Up Bidder") shall be returned.

25       3.    Proof of Financing Ability.  An Offer must accompanied by evidence satisfactory to the

26   Court of financial ability to close within the time frame established by the Court.  The Offer must

27   contain information, acceptable to the Court, which demonstrates to the Court that the Potential

28

-20-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1  Purchaser has sufficient financial ability to meet its commitments pursuant to its Offer and to close the

2  transaction within the time frame established.

3      4.    Identity of Bidder and Legal Power.  An Officer must disclose the identity of the

4  Potential Purchaser, including confirmation that its bid is made as principal for the Potential

5  Purchaser's account and, if not, the basis upon which the Potential Purchaser is acting and the

6  identities of all other participants (if any).  It must also disclose any agreements or understandings

7  between the Potential Purchaser and any third par with respect to the Property.  The Offer must also be

8  accompanied by sufficient indicia that the person submitting the Offer is legally empowered, by power

9  of attorney or otherwise, to (i) bid on behalf of the Potential Purchaser, and (ii) complete and sign, on

10  behalf of the Potential Purchaser, a binding and enforceable Bidder Purchase Agreement.

11      5.    Due Diligence Acknowledgment; Release.    The  Offer  must  contain  an

12  acknowledgement and representation that the Potential Purchaser (i) had an opportunity to conduct

13  any and all due diligence regarding the Property prior to making the Offer, (ii) has relied solely upon

14  its own independent review, investigation and/or inspection of any documents and/or the Property in

15  making its Offer, and, (iii) did not rely upon any written or oral statements, representations, promises,

16  warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, or

17  the completeness of any information provided in connection therewith or the Auction, except as

18  expressly stated in the Bidder Purchase Agreement.

19  **E.    NON-CONFORMING BIDS**

20    Notwithstanding anything to the contrary in the Sale Procedures, the Court shall have the right to

21  entertain bids that do not conform to one or more of the requirements specified herein and deem such

22  bids Qualified Bids.

23  **F.    EXPENSES**

24    Any Potential Purchaser shall bear its own expenses in connection with its bid and the proposed

25  sale, whether or not such sale is ultimately approved.

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-21-

## G. CONFLICT

Any conflict between the terms and conditions of the Sale Procedures Order and any Bidder Purchase Agreement or the APA, as applicable, shall be resolved in favor of the Sale Procedures Order.

## H. THE AUCTION AND SELECTION OF THE SUCCESSFUL BID

The Auction will be conducted on the date and time of the Sale Hearing in Courtroom 1575; 255 E. Temple Street; Los Angeles, CA 90012, the Honorable Samuel L. Bufford, presiding (the "Auction Date"). All Qualified Bidders must appear in person at the Auction, or though a duly authorized representative.  Each Qualified Bidder shall have the right to continue to improve its bid at the Auction.  The Auction will be conducted in an "open format" such that all participants will contemporaneously be made aware of the particulars of any Qualified Bids that are submitted.

The Auction will be conducted in all respects in the manner that the Bankruptcy Court determines will result in the highest, best, or otherwise financially superior offer(s) for the Property. Further procedures governing the Auction are set forth in ***Exhibit "A"*** attached hereto.  The Court may announce at or prior to the Auction additional procedures or rules for conducting the Auction.

At the conclusion of the Auction, and subject to Court approval at the Sale Hearing (immediately following the Auction), the Successful Bid shall be selected by the Bankruptcy Court.

## I. SALE HEARING

The Debtor intends to request at the hearing on this Motion on July 20, 2010 that the Court schedule the Auction and Sale Hearing on the earliest date and time convenient to the Court's calendar, which is in compliance with the notice requirements of the Bankruptcy Code, FRBP and LBR.  The Debtor may present additional evidence, as necessary, at the Sale Hearing to demonstrate that the relief sought in the Sale Motion, including approval of the Sale and the related assumption and assignment of the applicable Selected Contracts is fair, reasonable and in the best interest of the bankruptcy estate and its creditors.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Court's calendar on the date scheduled for the Sale Hearing or any adjourned date.

-22-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**J.   OBJECTIONS**

Objections to the sale of the Property to the Successful Bidder on the terms requested in the Sale Motion shall be set forth in writing and shall specify with particularity the grounds for such objections or other statements of position and shall be filed with the Court on or before the date fixed by the Court at the Sale Procedures Hearing – and shall be served so as to be received by that same date and time on (a) the Debtor's counsel – Sandford L. Frey of Creim Macias Koenig & Frey LLP; 633 W. 5th Street; 51st Floor; Los Angeles, CA 90071; (b) counsel for Rebel – Richard Brunette of Sheppard Mullin Richter & Hampton LLP; 333 South Hope Street; 43rd Floor; Los Angeles, CA 90071; (c) the Office of the United States Trustee; and (d) parties requesting special notice.

The failure of any objecting person or entity to timely file its objection shall be a bar to the assertion at the Sale Hearing or thereafter, of any objection to approval of the Sale to the Successful Bidder or the Back-Up Bidder on such terms, or consummation and performance of the APA with the Successful Bidder or the Back-Up Bidder, including the transfer of the Debtor's interest in the Property free and clear of all claims, liens, rights, interests and encumbrances pursuant to Bankruptcy Code § 363(f), any good faith finding with respect to the Successful Bidder under Bankruptcy Code § 363(m), and the exercise of right under Bankruptcy Code § 365 to assume executory contracts and the exercise of the right to assign the assumed executory contracts if the Stalking Horse Bidder is the Successful Bidder.  If a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder, counterparties may file and serve objections to the assignment of any assumed executory contract to the Successful Bidder until the day before the Sale Hearing.

**IV.**

**PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CONTRACTS**

At Closing, with respect to any Selected Contracts, the Selected Contracts will be assumed and assigned to the Successful Bidder.

The Debtor proposes to serve the proposed Cure Notice, in substantially the form annexed hereto as ***Exhibit "D"***, upon each of the Counterparties concurrent with the service of the Sale Motion. The Cure Notice will identify the Cure Amounts.  The Cure Notice will state the date by which any

-23-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1  objection to the Cure Amounts or the assumption and assignment of the Selected Contracts (other than

2  with respect to adequate assurance of future performance by any Successful Bidder other than the

3  Stalking Horse Bidder) must be filed and served, which the Debtor proposes to be at least (7) days

4  prior to the Sale Hearing.  If a contract is assumed and assigned pursuant to the Bankruptcy Court's

5  order approving same, then unless the affected Counterparty properly files and serves an objection to

6  the Cure Amount contained in the Cure Notice, the Counterparty will receive at the time of the

7  Closing (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure

8  Notice, with payment made pursuant to the terms of the APA, Bidder Purchase Agreement or Court

9  order, as applicable.  If an objection is filed by a Counterparty to the assumption of one of the Selected

10  Contracts with respect to the Cure Amount set forth in the Cure Notice, the Debtor proposes that such

11  objection must set forth a specific default under the Selected Contract and claim a specific monetary

12  amount that differs from the amount (if any) specified in the Cure Notice or, alternatively, state why

13  the Counterparty believes any Cure Amount is owing, and state the basis for any other objection to the

14  assumption and assignment of the Selected Contract (other than with respect to adequate assurance of

15  future performance for any Successful Bidder other than the Stalking Horse Bidder).

16  The Debtor further proposes that an objection to the assumption and assignment of a Selected

17  Contract with respect to adequate assurance of future performance by any Successful Bidder other

18  than the Stalking Horse Bidder may be filed and served at any time prior to the Sale Hearing or raised

19  orally at the Sale Hearing.  The Cure Notice also will state such objection deadline and the date, time

20  and place of the Sale Hearing.  The Stalking Horse Bidder or any other Successful Bidder may remove

21  any executory contract from the list of Selected Contracts any time prior to the Sale Hearing.

22  Subject to further Court approval or consent of the Counterparties, the Stalking Horse Bidder

23  may add to the list of Selected Contracts so long as the Debtor files and serves a supplemental Cure

24  Notice on the affected Counterparties within thirty days after the Sale.

25  The Successful Bidder shall be responsible for satisfying any requirements regarding adequate

26  assurance of future performance that may be imposed under Bankruptcy Code § 365(b) in connection

27  with the proposed assignment of any Selected Contract.  The Debtor proposes that the Court make its

28

-24-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

determinations concerning adequate assurance of future performance under the Selected Contracts pursuant to Bankruptcy Code § 365(b) at the Sale Hearing or in the case of any Selected Contracts not assumed and assigned to the Successful Bidder at the Sale Hearing, at such other hearing to approve assumption and assignment of such Selected Contracts.   The Debtor further proposes that Cure Amounts disputed by any Counterparty will be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant Selected Contracts.

Except to the extent otherwise provided in the APA or the relevant Bidder Purchase Agreement, subject to the payment of any Cure Amounts, the assignee of a Selected Contract will not be subject to any liability to the Counterparty that accrued or arose before the closing date of the sale of the Property.   Furthermore, the Debtor shall be relieved of any and all liability accruing or arising after the Sale Hearing pursuant to Bankruptcy Code § 365(k).

## V.

## ARGUMENT

The Sale Procedures are an appropriate means of maximizing value.   The inherent complexities involved in the sale of an asset of this type, the scope and complexity of the secured obligations, and the limited market for assets of this nature, all demand the immediate establishment of a clear, procedural framework to govern the conduct of the sale process.   Given the special circumstances respecting the limited market for these types of assets in the bankruptcy context, parties in interest are looking to the Court to provide clarity and certainty to the transaction process as soon as possible.

After notice and a hearing, a trustee or debtor in possession may sell assets outside the ordinary course of its business [Bankruptcy Code § 363].   In order to obtain approval of a proposed sale of assets, the moving party usually must show that the proposed purchase price is the highest and best offer available under the circumstances of the case.   See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558,564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary object of the code [is] to enhance the value of the estate at hand"); In re Integrated Res., Inc., 147 B.R. 650, 659 (S.D. N.Y. 1992) ("It is a well-established principle of bankruptcy law that the. . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting

-25-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1 | Cello Bag Co. v. Champion Intl Corn (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr.

2 | N.D. Ga. 1988)).

3 |    Here, the Debtor seeks approval of the Sale Procedures, including, but not limited to, the

4 | Overbid Increment, which it believes will result in the highest purchase price and the greatest benefit

5 | to creditors under the circumstances.

6 |    In connection with sales of assets outside of the ordinary course of business, bankruptcy courts

7 | frequently approve competitive bidding procedures as a means of ensuring that such sales will

8 | generate the highest and best returns to the debtor.  Courts have routinely held that when the sale of

9 | substantial assets in bankruptcy is done on a competitive bidding basis, as is proposed herein, it is

10 | appropriate to require parties submitting competing bids to submit bids that exceed existing bids by a

11 | specified minimum amount.  See, e.g., In re Financial News Network, Inc., 931 F.2d 217 (2d Cir.

12 | 1991) (requiring that overbids exceed the initial offer by 9.5 percent); In re Crown Corp., 679 F.2d

13 | 774 (9th Cir. 1982) (requiring that overbids exceed the initial offer by 4.9 percent, overbid amounts,

14 | deposits, and comparable deal terms to be used by all overbidders); In re Crowthers McCall Pattern,

15 | Inc., 114 B.R. 877, 879 (Ban. S.D.N.Y. 1990 (court entered order requiring that overbids be made in

16 | specified minimum increments with deposits); In re Financial News Network, Inc., 931 F.2d 217 (2d

17 | Cir. 1991) (requiring that overbids exceed the initial offer by 9.5 percent).

18 |    The initial Overbid Increment proposed herein is just slightly less than 2% of the total

19 | consideration offered by the Stalking Horse Bidder (inclusive of its credit bid) and less than 8% of the

20 | cash consideration, excluding the credit bid.  It is well within the bounds of reasonableness and will

21 | serve the purpose of enhancing recovery while encouraging the Stalking Horse Bidder to proceed.

22 |    The Debtor submits that sufficient cause exists to approve the proposed Sale Procedures,

23 | including the Overbid Increment, and other bid protections.  In general, the Sale Procedures are

24 | designed to solicit the highest and best price for the Property.  They provide for a fair and open

25 | Auction, where all Qualified Bidders are on the same footing.  The Stalking Horse Bidder is serving

26 | the very necessary purpose of establishing a bid standard and minimum bid.  The bidding incentives

27 | encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with the

28 |

-26-

1  Debtor and perform the necessary due diligence attendant to the acquisition of assets, despite the

2  inherent risks and uncertainties of the chapter 11 sale process. Specifically, the Stalking Horse Bidder

3  was understandably unwilling to commit to hold open its offer to purchase the Property without this

4  Motion and the protections requested herein. Further, the Stalking Horse Bidder has expended, and

5  likely will continue to expend, considerable time, money, and energy pursuing the Sale and has

6  engaged in extended and lengthy good-faith negotiations with the Debtor that have culminated in the

7  APA. The bid protections were a material inducement for, and a condition of, the Stalking Horse

8  Bidder's entry into the APA.    Given the intensive analysis, due diligence investigation, and

9  negotiation undertaken by the Stalking Horse Bidder in connection with the Sale, the Debtor believes

10  that such protections are fair and reasonable. Moreover, the Stalking Horse Bidder's participation in

11  this process has increased the possibility that the Debtor may receive the highest and best offer for the

12  Property both by establishing a bid standard or minimum for other bidders at the Auction, and by

13  serving as a catalyst for other potential or actual bidders. Moreover, the Stalking Horse Bidder is not

14  seeking a break-up fee. Thus, under any approach, approval of the Motion is appropriate in this case.

15      Therefore, in order to provide a framework for interested parties to formulate their bid and

16  commit to the process established by the Debtor, which is designed to yield the highest and best offer

17  for the Property, the Debtor requests that the Court approve the Sale Procedures, including, the

18  Overbid Increment.

19  **A.    REBEL SHOULD BE AUTHORIZED TO CREDIT BID**

20      Among other secured claims held by Rebel, Rebel asserts a $6,000,000 Senior Secured Note

21  ("Joloto Note") and claim against Debtor that Rebel acquired from Joloto (see chart above). Attached

22  collectively hereto as ***Exhibit "F"*** are copies of the Secured Note, the UCC Financing Statement, and

23  the Allonge by which Joloto assigned the Joloto Note to Rebel. Thus, Rebel asserts a senior secured

24  claim against Debtor in excess of $6 million by virtue to the Allonge, excluding the other notes and

25  interest asserted by Rebel.

26      As set forth in the Intercreditor Agreement [***Exhibit "E"***], all senior and junior secured creditors

27  of Debtor, including Charles Brennan and DLC (collectively, "DLC"), which became parties to the

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-27-

Intercreditor Agreement after the Intercreditor Agreement was originally executed and became effective, agreed that any Senior Noteholder could credit bid for Debtor's assets.[3]  The Intercreditor Agreement provides in pertinent part:

> Any Senior Noteholder may make a credit bid at any foreclosure sale or other sale of any of the Collateral; provided, that the other Senior Noteholders receive a cash payment as a result of such credit bid equal to their ratable share of the consideration that would have been received under this Agreement had such credit bid been paid in cash.

[See, Intercreditor Agreement, Section 3(g)].

Bankruptcy Code Section 363(k) explicitly provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secured an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

As will be set forth more fully in the Sale Motion, the Debtor does not believe that the sale will result in an offer in excess of the senior secured debt, based upon its marketing efforts, knowledge of the assets, and the market conditions, among other reasons.

At the initial hearing on sales procedures, this Court expressed two potential concerns with the proposed transaction: (i) whether a secured creditor such as Rebel may credit bid in light of In re Philadelphia Newspapers, LLC, 599 F.3d 298 (3rd Cir. 2010), and (ii) even if a secured creditor may credit bid, why the Court should allow Rebel to do so if the estate is receiving no benefit.  The Debtor and Rebel have addressed these concerns, as set forth below.

Philadelphia Newspapers may be distinguished from the case before this Court on a number of grounds.  The Philadelphia Newspapers case involved a sale that was occurring through a plan under Bankruptcy Code §1129.  Conversely, the sale in this case is not being proposed through a plan, but rather under Bankruptcy Code §363(b).  In Philadelphia Newspapers, under the plan, the stalking horse bidder had made a cash offer for the assets.  The secured creditor wanted to credit bid, which the debtor opposed.  Thus, the court in Philadelphia Newspapers had to determine whether the creditor was entitled to credit bid for its collateral in a sale conducted pursuant to a plan.

---

[3]  DLC'S security interest is unperfected since dlc did not file a financing statement.

-28-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

In the plan context, under Section 1129(b)(2)(A)(ii), a secured creditor can credit bid for assets because a debtor can sell property free and clear of secured creditors' liens at an auction subject to Section 363(k), which specifically allows credit bidding by secured creditors unless the bankruptcy court "for cause" orders otherwise.  In the alternative, Section 1129(b)(2)(A)(iii) authorizes a debtor to confirm a plan that provides secured creditors with the "indubitable equivalent of [their] claims."  The Third Circuit held that the debtor therefore had the choice of (i) an auction where the secured creditor could overbid under 1129(b)(2)(A)(ii), or (ii) an auction for cash where the creditor receives the "indubitable equivalent" of its claims under 1129(b)(2)(A)(iii), in which case there is no right to credit bid. 599 F.3d at 305.  In <u>Philadelphia Newpapers</u>, the debtor chose to proceed under (A)(iii).  Because 1129(b)(2)(A)(iii) contains no statutory authorization for credit bidding (unlike (A)(ii)), if the debtor chose (A)(iii) (as it did), the secured creditor had no right to credit bid.  599 F.3d at 301.  Thus, the court had no discretion to allow the secured creditor to credit bid because there was no statutory authorization for credit bidding given the debtor's choice of proceeding under (a)(iii), where section 363(k) does not apply.

Our case is different and this court does have discretion to allow Rebel to credit bid under 363(k) because Section 1129 has no applicability here.  Section 1129 does not apply because the proposed sale is not pursuant to a plan.  Therefore, the "indubitable equivalent" option is not available.  Thus, in the sale context (unlike the plan context), the Debtor has no "indubitable equivalent" option and only 363(k) applies.   In fact, the Third Circuit made this very distinction between a plan sale under Bankruptcy Code §1129 and a sale under Bankruptcy Code §363, concluding that a secured creditor may be precluded from credit bidding only when the sale is pursuant to a plan:

> "Finally, our holding here only precludes a lender from asserting that it has an absolute right to credit bid when its collateral is being sold pursuant to a plan of reorganization."

<u>Philadelphia Newspapers</u>, 599 F.3d at 317.

Therefore, the court in <u>Philadelphia Newpapers</u> recognized that credit bidding is allowed under subsections i and ii of 11 U.S.C. 1129(b)(2)(A).  593 F.3d at 313, <u>citing</u>, <u>In re California Hancock</u>, 88 B.R. 226, 230 (9th Cir. B.A.P. 1998) (requiring credit bidding where confirmation was sought under subsection (i) and <u>In re Kent Terminal</u>, 166 B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) (holding that

-29-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1  "lienholder has the unconditional right to bid in its lien" under subsection (ii).  In addition, the Debtor

2  here (unlike the debtor in _Philadelphia Newspapers_) is supportive of Rebel's 363(k) credit bid rights.

3  The Debtor realizes that the analysis does not end there, and that the right to credit bid is subject

4  to there being no cause for the Court to preclude credit bidding, i.e., that this court has discretion.  In

5  this regard, there does not appear to be justification for disallowing the right to credit bid.  In re

6  Lehigh Coal and Nav. Co., --- B.R. ----, 2010 WL 2025211, *1 (Bankr.M.D.Pa. Apr 02, 2010)

7  (**_Exhibit "G"_**), decided subsequent to the _Philadelphia Newpapers case, is worth noting due to its_

8  _similarity to this case.  In that case, the debtor, Lehigh Coal,_ filed a Motion authorizing sale as well as

9  a request to approve bidding procedures.  Objections to the bidding procedures were filed, and, at the

10  request of the Debtor, an expedited hearing was set because of the fragility of _Lehigh Coal_'s situation.

11  The objections were filed by five non-debtor entities.  The central challenge raised by the objecting

12  creditors was whether the stalking horse bidder had the right to credit bid free from the constraints of

13  an investment agreement in which the bidder allegedly surrendered certain rights to act independent of

14  the group.  In short, the objecting creditors did not suggest that the stalking horse is not qualified to

15  bid as a holder of an allowed claim secured by a lien under Bankruptcy Code § 363(k).  Rather, the

16  Objecting Creditors argued that individual action would subject that creditor to exposure to fellow

17  noteholders.  The court in the _Lehigh Coal case permitted the right to credit bid over the objections_

18  _despite the_ language in investment agreement that allegedly required members of investment group to

19  share benefits pro rata.

20  The Debtor is not aware of any bona fide dispute at this time respecting the validity of Rebel's

21  claim and lien.  While the right to credit bid is not absolute as the statute authorizes the Court to deny

22  such right for cause, logic dictates that the credit bid right under Bankruptcy § 363(k) be permitted in

23  this case.  Inasmuch as no bona fide dispute has been raised respecting the validity of Rebel's lien,

24  until Rebel is paid in full Rebel can always overbid any third party bidder.  As a lender holding the

25  senior secured debt, Rebel will then claim all of the cash proceeds by virtue of its senior secured

26  interest.  Thus, there appears to be no practical benefit to estate for restricting its credit bid rights in

27  this case.  If a competing offer is hopefully submitted, Rebel will cease bidding or alternatively cease

28

-30-

1    credit bidding only at the point in time that Rebel believes that it can no longer generate a greater

2    return for itself than the return represented by the competing offer.

3       Since the prior hearing, the parties have continued to negotiate and have attempted to address the

4    Court's second concern.  The estate is receiving a substantial benefit from this transaction.  If Rebel is

5    the successful bidder, Rebel has paid and/or will pay a total of at least $260,000 for post-petition

6    administrative expenses - professional fees of $110,000, rent to the landlord of $144,000, and

7    advertising expenses of $6000 or more.  Moreover, since the initial hearing, Rebel has now agreed to

8    increase its offer by $100,000 cash for the estate.  Thus, while Rebel's bid includes a $1.3 million

9    credit bid component (and Rebel will be entitled to continue to credit bid if there are any overbidders),

10    Rebel's bid also includes a cash component of $360,000, at least $100,000 of which should be

11    available for creditors.

12       Under the circumstances, the estate is better off with this transaction than without it.  Pursuant to

13    this transaction, Rebel is paying the administrative expenses of the estate.  The estate is receiving

14    $144,000 in administrative rent and $60,000 for professional fees.  Moreover, Rebel is providing

15    $100,000 for creditors.  Additionally, there is a possibility that there will be overbidders.  By contrast,

16    the alternative to this transaction is bleak.  The estate would not receive $144,000 in administrative

17    rent or an additional $60,000 toward professional fees, resulting in accrued administrative expenses,

18    which likely would render the estate administratively insolvent.  The estate would not receive an

19    additional $100,000.  Finally, the assets are located in the Debtor's commercial space.  Absent a sale,

20    the Debtor will continue to accrue administrative rent at the rate of approximately $60,000 per month

21    (the original lease rate), and lacks the financial ability to pay for such space.  The Debtor does not

22    have the current financial ability to disassemble the assets, move the assets and/or store the assets.

23    Moreover, the Debtor does not believe that the assets will bring a price in excess of the senior secured

24    debt.

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-31-

1

## VI.

2

## CONCLUSION

3    The Debtor believes that the foregoing Sale Procedures provide an appropriate framework for

4    the Debtor to expedite the process of gathering bids and are intended to encourage competitive bidding

5    which is in the best interests of the estate and creditors.  Therefore, the Debtor respectfully requests

6    that the Court enter an order (a) approving the proposed Sale Procedures, including the Overbid

7    Increment; (b) scheduling the dates and times of the Auction and Sale Hearing; (c) approving the

8    APA, the Stalking Horse Bidder and the right to credit bid; (d) authorizing the Debtor to sign the

9    APA; (e) approving the form of the proposed Notice of Auction and Sale Hearing and the manner of

10   service of same; (f) approving the procedures for the assumption and assignment of executory

11   contracts; (g) approving the form of the proposed Cure Notice and the manner of service of same; and

12   (h) granting such other relief as is fair and equitable.

13   Dated:  July 13, 2010                          CREIM MACIAS KOENIG & FREY LLP

14

15                                                  By:  /s/Sandford L. Frey_____
                                                        SANDFORD L. FREY
16                                                      RICHARD C. MACIAS
                                                   [Proposed] Reorganization Attorneys for NGTV,
17                                                 Debtor and Debtor in Possession

18

19

20

21

22

23

24

25

26

27

28

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

### DECLARATION OF KOUROSH TAJ

I, Kourosh Taj, declare as follows:

1. I am an officer of the Debtor. I have been actively involved in marketing the Debtor's business and seeking capital for the Debtor's business from potential investors. If called to testify, I could and would testify competently concerning the contents of this Declaration. My knowledge of the facts set forth herein is based on my personal knowledge. I submit this Declaration in support of the Motion to Approve Sales Procedures.

2. I have been involved in the entertainment business for over sixteen years in the areas of writing, producing, booking talent, and other related areas. During the course of working in these areas, I have become acquainted with and formed relationships with a wide variety of companies and individuals in the entertainment industry.

3. The Debtor is burdened by an enormous amount of secured debt in excess of the aggregate amount of $15,934,949 (excluding additional accrued interest), consisting of $8,839,968 in senior secured and $7,094,981 in junior secured (excluding various equipment lessors and creditors and judgment creditors).

4. The Debtor's primary assets are the content library, studio, trade name and trademarks. The value of the library is difficult, if not impossible, to ascertain; as, among other reasons, the library consists of raw footage of celebrity interviews, and is also subject to competing licensing restrictions. In addition, most of the raw footage has not been produced or edited. Further, there are unpaid production costs, which impact its value. Adding to the complexity is that the value of the older footage is much lower than new footage, due to the topical nature of the footage. This value may continue to diminish without infusion of capital. In addition, it is difficult to exploit the archived footage, without adding new relevant footage.

5. Based upon my connections or through the connections of some of the other Directors, the Debtor has been meeting with potential investors/purchasers for a long period of time without success. The investors' interest in the Debtor stemmed from their knowledge of the Debtor's content library, the Debtor's trade name and trademark brand, my entertainment connections, and the talents. As a

-33-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1   result, the investors were initially interested in meeting with the Debtor.  In the meetings with various

2   investors, the Debtor was able to pitch its ideas for media projects for cable or satellite television or

3   other media projects.  The Debtor sought to demonstrate that the infusion of capital would create

4   numerous opportunities for the Debtor to exploit and use its assets for the production of television

5   shows, and other related projects.

6       6.  During our discussions with investors, we discussed the content of the Debtor's library,

7   which is one of the Debtor's assets.  Within the library are approximately 10,0000 hours of unedited

8   interviews with what could best be described as the A-list of Hollywood talent.  The footage was

9   obtained when the Debtor conducted interviews with these A-List celebrities over the course of several

10  years.  Some of the footage has been aired on the Debtor's website.

11      7.  In the last couple of years, I have been involved in finding investors interested in providing

12  capital, which would provide the necessary funding for the Debtor to continue its operations.  In

13  meetings with various investors during this time period, the Debtor's intent at all times was to find

14  investors and or purchasers to assist the Debtor and provide the necessary financing to take the Debtor

15  through the difficult period, which it is and was experiencing because the operational costs are

16  exceeding the revenue, which the Debtor is and was currently making.  The Debtor also spoke to

17  various existing creditors, including Rebel Media.

18      8.  The Debtor is not the type of business in which a financial institution would be willing to

19  provide financing because of the risks inherent in financing entertainment projects, particularly in this

20  type of economy.  The Debtor recognized that it's best opportunity for finding capital would be

21  through private funds, such as private media companies or other investors who have demonstrated an

22  interest in financing entertainment-media projects and/or, productions and/or entertainment-type

23  companies.

24      9.  Prior to the Debtor filing for bankruptcy, the Debtor was involved with discussions with

25  various individuals or companies.  In the Fall of 2009, the Debtor met with an investment company,

26

27

28

-34-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

which had funded a major cable television series.  I will refer to them as Media Fund Company No. 1.[4]  During the course of negotiations, the Debtor met with the principals of Media Fund Company No. 1 and its lawyers.  While the Debtor was hopeful of receiving financing from Media Fund Company No. 1, it ultimately decided that the Debtor was not producing sufficient revenue.  Media Fund Company No. 1 was provided financial information about the Debtor, but no extensive due diligence was done by Media Fund Company No. 1.  At the time, the Debtor was seeking approximately three to four million dollars of capital from Media Fund Company No. 1.

10. Prior to the Chapter 11 Bankruptcy Petition, the Debtor met with Media Fund Company No. 2.[5]  Media Fund Company No. 2 had previously funded internet websites so its interest in the Debtor was based upon the Debtor's website and other related projects emanating from the Debtor's website.  The Debtor was in negotiations with Media Fund Company No. 2 for an extensive period of time; however, they had concerns regarding the Debtor's brand and finding a fit, which would be profitable for it.  Ultimately, Media Fund Company No. 2 decided against providing any funding to the Debtor, or funds to purchase the company.

11. Just prior to the Debtor's filing of Chapter 11, the Debtor met with a Private Company who represented a number of private investors.[6]  The Debtor had two meetings with this Private Company regarding how the Debtor's debt could be effectively restructured so that the Debtor could pay off its existing debts and continue its operations.  There were some discussions regarding whether the Debtor should be funded so that it could be taken public.  Like some of the other investors, Private Company was concerned about the revenues of the Debtor and its enormous debt.  While the initial meetings were positive, the Private Company finally determined that it did not want to provide funding to the Debtor.

/ / /

/ / /

---

[4] The Debtor has not disclosed the name in the public record due to confidentiality considerations.  If the Court requires, the Debtor will be willing to provide this information to the Court in camera.

[5] See footnote 1.

[6] See footnote 1.

-35-

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

12. Both prior to and just after the filing for Chapter 11, the Debtor met with Media Company No. 3.[7] Media Company No. 3 is a very well-known entertainment company, which has financed many major films. Media Company No. 3's interest in the Debtor stemmed from some of the Debtor's projects, which were in various stages of development. Media Company No. 3 eventually decided to pass due to the speculative nature of the business and the enormous amount of debt.

13. The Debtor also had discussion with Rebel to fund ongoing operations. Unfortunately, negotiations were not complete, when mounting financial pressure compelled the Debtor to file Chapter 11 on an emergency basis in order to attempt to preserve the value of its assets. Escalating pressures by a few creditors was slowing down and distracting the progress of concluding a prepackaged deal with Debtor's senior secured creditors. Additionally, it was hoped that bankruptcy protection would assist the Debtor in reaching agreement for the preservation of its studio lease, which was in default.

14. As part of the negotiation toward a consensual plan, negotiations were held with Rebel for bridge debtor in possession financing necessary for the Debtor to pay, among other post petition obligations, its Chapter 11 professional fees and other administrative costs, including post petition rent on Debtor's studio lease. Rebel agreed to loan the Debtor a $50,000 retainer for the Debtor's bankruptcy counsel. This loan was approved by the Court and made by Rebel. Moreover, based upon a recent stipulation among the Debtor, Rebel, and Debtor's landlord, Rebel has agreed to fund $144,000 necessary to satisfy the landlord's post-petition rent obligations. This will permit the Debtor to retain possession of the space through July 31, 2010, without any additional administrative burden resulting from the rent obligation. Upon Court approval thereof, Rebel will make that loan.

15. In connection with the proposed sale, Rebel has agreed to advance on behalf of the estate an additional $6,000 for advertising expense. Therefore, Rebel will have advanced an aggregate amount of $200,000 in connection with the chapter 11 case. Rebel will waive such claim as part of the consideration for its purchase of the Property. However, in the event the Successful Bidder is not the

---

[7] See footnote 1.

-36-

I:\slf\20118 (NGTV)\Motion to Approve Sale Procedures Revised (3)Final.DOC

1   Stalking Horse Bidder, the Stalking Horse Bidder seeks the Expense Reimbursement to compensate it

2   for its actual out of pocket expense incurred in connection with the chapter 11 case.

3       16. The Debtor has no source of revenue with which to continue to fund operations, pay rent

4   for its commercial space, or to maintain its equipment, assets employees or physical facility.  Under

5   the current circumstances, the proposed auction at least appears to provide the best means of

6   producing some value for the estate as compared with the alternative of foreclosure of the Debtor's

7   assets by the senior secured creditors.  Rebel has agreed to become a Stalking Horse Bidder and to pay

8   the cost of advertising the sale so as to attempt to maximize value.  The Debtor hopes that this will

9   encourage competitive bidding for the assets so as to maximize the value.  Further, delay will continue

10   to jeopardize the value of the assets, particularly if the Debtor is compelled to move the equipment

11   without a suitable location.

12       I declare under penalty of perjury, under the laws of the United States of America, that the

13   foregoing is true and correct and that this declaration was executed on ~~June~~ *July 14* 22, 2010 in Beverly Hills,

14   California.

15

16                       Kourosh Taj

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

-37-